ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Lean Construction and Engineering Co. | )   ASBCA No. 59016 |
| | ) |
| Under Contract No. W56SGK-13-C-7073 | ) |

APPEARANCE FOR THE APPELLANT:   Mr. Abdul Ghafar Rassin
                                 Executive Director

APPEARANCES FOR THE GOVERNMENT:   Raymond M. Saunders, Esq.
                                   Army Chief Trial Attorney
                                   LTC Brian J. Chapuran, JA
                                   MAJ Michael G. Pond, JA
                                   Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE PAUL

This is a timely appeal of a contracting officer's (CO's) decision partially terminating appellant, Lean Construction and Engineering Co.'s (Lean's) construction contract for default. The Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, is applicable. A hearing was held at the Board's offices. Only entitlement is before us. We deny the appeal.

FINDINGS OF FACT

1. On 15 April 2013, the Regional Contracting Center-Capital, Afghanistan, awarded Contract No. W56SGK-13-C-7073 to Lean for specified construction work to augment force protection measures at an Afghan National Army Logistics depot in the province of Kabul and to upgrade the base's western entry control point (ECP) to facilitate two-way traffic (R4, tab 1 at 1-2, tab 2 at 225).

2. Pursuant to CENTCOM Clause 952.232-0004, PAYMENT IN LOCAL CURRENCY (AFGHANISTAN) (AUG 2011), the contract was awarded on the basis of the local Afghan currency in a fixed-price amount of AFN 6,918,859.84. Based upon the exchange rate prevailing on the date the contract was awarded, this constituted approximately $142,297.20. (R4, tab 1 at 3-4, 7-8)

3. The contract incorporated by reference a host of Federal Acquisition Regulation (FAR) clauses. Those pertinent to this appeal include FAR 52.236-5(c), MATERIAL AND WORKMANSHIP (APR 1984), which provided, in pertinent part: "All work under this contract shall be performed in a skillful and workmanlike manner"

(R4, tab 1 at 5). Also relevant is FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984), which stated:

> (a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extensions, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated. This liability includes any increased costs incurred by the Government in completing the work.

(R4, tab 1 at 24) FAR 52.236-12, CLEANING UP (APR 1984), is also pertinent. It provided:

> The Contractor shall at all times keep the work area, including storage areas, free from accumulations of waste materials. Before completing the work, the Contractor shall remove from the work and premises any rubbish, tools, scaffolding, equipment, and materials that are not the property of the Government. Upon completing the work, the Contractor shall leave the work area in a clean, neat, and orderly condition satisfactory to the Contracting Officer.

(*Id.*)

4. The contract also contained 13 attachments which described in minute detail the various technical requirements. They were listed as follows:

2

SOLICITATION ATTACHMENTS
ATTACHMENT TABLE OF CONTENTS

| DOCUMENT TYPE | DESCRIPTION | PAGES | DATE |
|---|---|---|---|
| Attachment 1 | TFP Standard Specifications | 83 | 18 Jun 2009 |
| Attachment 2 | ANSF Construction Standards | 10 | 5 Sep 2011 |
| Attachment 3 | Concrete Tower Design | 22 | N/A |
| Attachment 4 | Two Connex Guard Tower | 15 | N/A |
| Attachment 5 | Site Layout | 1 | N/A |
| Attachment 6 | Solar Panel Specs | 10 | N/A |
| Attachment 7 | Proposed ECP Drawing | 1 | N/A |
| Attachment 8 | Steel Panel Gates | 10 | N/A |
| Attachment 9 | Drop Gate Standard Design | 6 | N/A |
| Attachment 10 | Guard posts | 1 | N/A |
| Attachment 11 | Hesco Wall | 7 | N/A |
| Attachment 12 | Chain Link Fence Design | 6 | N/A |
| Attachment 13 | Statement of Work | 7 | N/A |

(R4, tab 1 at 32)

5. Attachment 1 contained the Coalition Joint Task Force Phoenix Engineers Standard Specifications (R4, tab 1 at 33-115). Part 1, "General Requirements," of the specification included the following, pertinent provisions:

> 4. Material: All materials shall be new and free of defects unless otherwise approved by the Contracting Officer Representative (COR). The Contractor shall remove defective materials from the site at no additional cost to the U.S. or Afghan Government.
>
> ....
>
> 6. Quality of Work: All work shall be conducted in a professional manner, in accordance with accepted methods of construction, as detailed in the attached specifications. U.S. and Afghan Government personnel on site shall make regular inspection of work as it progresses. When work is completed at each stage of the project, Contractor shall submit work for inspection and be signed off by U.S. or Afghan Government personnel on site.
>
> ....

9. Clean up:  The Contractor shall clean up the work site at the end of every work day and upon project completion, including the removal of all debris and refuse from the site, to the satisfaction of the Contracting Officer Representative (COR).

(R4, tab 1 at 34-35)

6. Part 2 of the Standard Specifications was entitled "Site Construction." Subsection 2.1 of section 2.0, "GENERAL EXCAVATION," provided:

> Contractor shall perform excavation of every type of material encountered within the limits of the project to the lines, grades, and elevations indicated and specified. Contractor shall transport satisfactory excavated materials and place in fill or embankment within the limits of the work.  Contractor shall excavate unsatisfactory materials encountered within the limits of the work below grade and replace with satisfactory materials as directed.  Contractor shall include such excavated material and the satisfactory material ordered as replacement in excavation.  Contractor shall dispose surplus satisfactory excavated material not required for fill or embankment in areas approved for surplus material storage or designated waste areas. Contractor shall dispose unsatisfactory excavated material in designated waste or spoil areas.  During construction, Contractor shall perform excavation and fill in a manner and sequence that will provide proper drainage at all times.

(R4, tab 1 at 42-43)

7. Part 3 of the Standard Specifications was entitled "Concrete."  Section 1, also styled "Concrete," contained the following, relevant subsections:

> 1.1.  Cement:  3000 PSI (20.0 MPa) Type I Portland Cement Concrete or equivalent will be utilized in the completion of this project.  The Contractor will be required to prepare and place all concrete to include the specific requirements described below. The contractor shall submit the name and brand of concrete for the COR to approve.

4

1.2. Materials: Concrete will consist of the following ingredients only:
1.2.1. Portland Cement (Type 1) or equivalent
1.2.2. Clean Sand (0.15mm – 4.75mm)
1.2.3. Clean Course Aggregates (10mm-25mm crushed stone)
1.2.4. Clean Water
1.2.5. TF Phoenix Engineer Approved Chemical Admixtures

1.3. Concrete specifications: Basic Structural concrete shall at least meet these specifications:
1.3.1. Designed strength = 21MPa = 3000 psi
1.3.2. Minimum Cement content = 340kg/cubic meter
1.3.3. Maximum Water/Cement ratio = 0.68 by volume
1.3.4. Maximum coarse aggregate size = 25mm
1.3.5. Slump Range = 101.6mm – 152.4mm

1.4. Concrete Mix: All mix aggregates will be free of dirt, dust and debris contamination. Any mix water used will be free of organic materials and dirt, and will not have an excessive mineral content. Concrete will be mixed mechanically in an appropriate enclosure; to ensure adequate mixing, proper hydration and temperature control. HAND MIXING OF CONCRETE IS SPECIFICALLY PROHIBITED. An example of this is mixing concrete with a shovel on the ground or in a wheelbarrow.

....

1.7. Concrete Protection and Curing: The Contractor shall protect the concrete in such a manner as to maintain a constant temperature between 50°F (10 °C) and 90°F (32.2°C) for 7 days. Acceptable methods of concrete protection include: insulating layers, moisture barriers, curing compound, or environmental enclosures. Continuous moist curing is the most desirable objective. Moist curing for 7 days will typically ensure the 28-day strength will

5

eventually be reached. The proposed method of protection shall be indicated in the bid proposal package.

....

2. All concrete shall be kept moist to facilitate the concrete curing phase for a minimum of 72 hours after placement however 7 days is preferred.

2.1. Ground Preparation: All concrete slabs and foundations will be placed on a properly consolidated base course, at least 200mm (8 inches) thickness. Base course material shall consist of 10mm – 50mm (3/8 inch – 2 inches) crushed stone. Compaction may be accomplished by roller, tamping plate, or any suitable method approved by COR. Sub-grade and base course will be drained and free from any voids or organic materials to a depth of 46 cm (18 inches). The excavated area where the concrete will be placed should be clean, damp, and free from debris, frost, ice, and standing or running water.

2.1.1. Vapor Barrier: A minimum layer of 0.4mm plastic shall be placed between the concrete foundation and the existing soil to act as a vapor barrier. All joints shall be overlapped 30cm.

2.2. Steel Reinforcement: If specified, concrete will be provided with sufficient steel to provide tensile support and prevent cracking. All steel reinforcing bar junctions and lap joints will be welded or tied with steel wire ties. See Metals, Section 5 for additional information.

(R4, tab 1 at 51-53)

8. The Standard Specifications also included a section called "HESCO Wall" (R4, tab 1 at 192-98). Chief Petty Officer Kevin Locher, the government's COR for much of the contract period, defined a HESCO wall in these terms:

6

A HESCO is, it's a barrier, and what it is, it's a wire mesh cage, and they've got different sizes in height and in thickness, and inside that cage there's a fabric, and what you do is, you set those up and you fill them full of sand or dirt, and it becomes a security barrier against explosions, against gunfire, builds a big dirt wall for you, is what it basically does, and then you can line them up, you can stack them on top of each other to build the size walls that you need.

(Tr. 2/24-25) The following provisions of this section are pertinent to this appeal:

11. **Concertina Wire**: The contractor shall install two rows of concertina wire along the top of the wall. After a sufficient curing of the concrete cap, two rows of concertina wire shall be installed. The bottom row shall be located along the outer step of the lower HESCO container and the top row shall be located along the center of the top HESCO container. Each roll of concertina wire shall be stretched no more than 13 m (42 ft). [C]oncertina wire strands shall be secured onto the steel picket top notch using steel wire. Consecutive coils of concertina wire shall be connected at the steel picket as follows:

   11.1.   Place the first coil over the picket.
   11.2.   Place both bottom and top portion of the second coil over picket.
   11.3.   Using steel wire, ensure that the top of both coils are secured to the picket.
   11.4.   The contractor shall provide the wire to secure the concertina wire to the pickets.

(R4, tab 1 at 192-94)

9. Attachment #6 to the contract was styled: "SOLAR PANEL SPECS PACKAGED PHOTOVOLTAIC SYSTEM." Subsection 1.1, "SUMMARY," of Part 1, "GENERAL" stated:

   A. This specification section covers Photovoltaic (PV) System requirements including, but not limited to equipment, hardware, software, documentation, labor, materials, and supervision required for the installation

7

and maintenance of a self[-]contained, packaged, photovoltaic system.

B. This system includes factory, pre-assembled, photovoltaic cells, charge controllers, power inverters, batteries, shunts, over-current protection devices, interconnecting cable, meter, and shipping-operating container to form a complete and operational photovoltaic system capable of providing renewable power to the facility. The system will also include battery storage for a 24 hour autonomy period. [The] system inverters will be capable of interconnect with the emergency power diesel generator to provide power should the autonomy period exceed 24 hours.

C. Section includes, but is not limited to the following:
1. Infrastructure, wiring, connection, and testing;
2. Solar panels and panel arrays;
3. Service disconnect switches;
4. DC combiners;
5. Inverters;
6. Monitoring equipment and Control software;
7. Identifications and signs;
8. Shipping-operating containers;
9. Provide all labor and materials, and make all necessary connections.

(R4, tab 1 at 164)

10. Pertinent, detailed specifications relating to the solar panels included:

3.4 MODULAR PV ARRAY INSTALLATION

A. The Contractor shall design, construct and install the modular PV arrays on reinforced concrete footers. Footers shall extend deeper than the soil frost depth for the location installed, but not less than 800mm to bearing. Extend footers a minimum of 200 mm above finished grade.

B. Provide and install galvanized steel j-bolts and clamps to fasten containers to footers. J-bolts and

8

clamps shall be designed to withstand seismic events for the location.

C. Provide a minimum of 1200 mm between array rows.

D. Route all wiring from PV array to building in conduit underground and stub up to inside of storage-operating container as appropriate.

E. Provide and install copper clad steel ground rods, minimum of 3000mm x 19 mm at each corner of the array and bond with copper ground conductor per NFPA 70, Article 250.

(R4, tab 1 at 169-73)

11. Attachment 12 to the contract was entitled "Chain Link Fence." The specifications provided:

1. Chain Link Fence

1.1. Site Preparation: The Contractor shall prepare the site in accordance with Task Force Specification PART 2 Site Preparation.

1.2. Posts and Braces:

1.2.1. The post spacing and configuration shall be arranged per Chain Link Fence Site Plan and Details. When barbed wire and concertina wire are required on the fence, each post shall have equally spaced outriggers.

1.2.2. Braces shall be used in each bay adjacent to the corner posts. Braces shall be used on each swing gate door. Braces and posts shall be of 7.5 cm (3 in) diameter pipes. The base metal shall be weldable steel of commercial quality, or better. The steel shall be galvanized or have an equivalent protective coating.

9

1.2.3. The post shall be set in concrete foundation with diameter of 30.5 cm (12 in) and 61 cm (24 in) deep. The minimum embedment length for the posts shall be 50 cm (18 in). The concrete shall be placed according to the Task Force Specification PART 3 Concrete.

1.3. Fence Fabric:

1.3.1. The fence fabric shall be 4 mm (9-gage/0.148 in) diameter that is woven into approximately 5 cm (2 in) mesh such that there shall be at least 7 meshes in a vertical dimension of 58.5 cm (23 in) along the diagonal of the openings. The fence fabric shall have knuckled finish on the top and bottom edges.

1.3.2. The fence fabric shall be stretched and securely fastened to corner posts with stretcher bars having dimensions of not less than 0.6 cm x 1.9 cm (1/4 in x 3/4 in) and stretcher bar bands having dimensions of not less than 0.3 cm x 1.9 cm (1/8 in x 3/4 in) spaced at 30.5 cm (12 in) intervals. The fence fabric shall also be fastened to intermediate posts with tie wires or post clips and to tension wires with tie wires or hog rings. The fasteners shall be spaced at approximately 35.5 cm (14 in) on intermediate posts and at approximately 50 cm (18 in) on tension wires.

1.3.3. Tie wires and hog rings shall be at least 4 mm (9-gage/0.148 in) diameter steel and post clips shall be at least 5 mm (6-gage/0.192 in) diameter steel. Wire ties shall be given at least one complete turn. Hog rings shall be closed with ends overlapping. The tension wires shall be wrapped around end posts. The distance from the top of the fabric to the top tension wire

and from the bottom of the fabric to the bottom of the tension wire shall be 75 mm (3 in) maximum. The tension wires shall be at least 0.5 cm (6-gage/0.192 in) diameter coil spring steel. Tension wires shall be stretched tight. The bottom tension wire shall be installed on a straight grade between posts by excavating the high points of ground and in no case will filling of depressions be permitted.

1.3.4. All tension wire, tie wires, hog rings and post clips shall be of good commercial quality and shall be galvanized or be coated with an equivalent protective coating according to Task Force Specification PART 5 Metals.

1.4. Swing Gate:

1.4.1. If a swing gate is required, it shall be fabricated from 5 cm (2 in) diameter weldable steel and be galvanized or have an equivalent protective coating. Each gate section shall be hung by at least 2 steel hinges not less than 13 cm (5 in) in width. The hinges shall securely clamp to the gate post and permit the gate to be swung back against the fence. The bottom hinge shall have a socket to take the ball end of the gate frame. Fence fabric shall be welded to the frame. The swing gate shall have a commercial grade steel lock clasp.

1.5. Shade Fabric/Screen[:]

1.5.1. If shade fabric is required, it shall be fabricated from a sun-resistant PVC material. The screen material shall have the same dimensions as the fence. It shall be hung with metal ties and shall be pulled taut prior to tying.

(R4, tab 1 at 199-201)

11

12. Attachment 13 was the contractual "Statement of Work" (SOW). Section 1 was entitled "GENERAL CONTRACT REQUIREMENTS," several of which are pertinent to this appeal. Included among them are:

1.1. Purpose: The purpose of this project is to increase the force protection measures of the Depot perimeter and upgrade the western ECP to facilitate two-way traffic.

1.2. Contract Completion Date: The contract shall be completed no later than 90 days after the determined Notice to proceed from the Contracting Officer (CO).

....

1.3. Material: All materials shall be new and free of defects unless otherwise approved by the COR/CO. The Contractor shall remove defective material from the site at no additional cost to the Government.

....

1.8. Clean up: The Contractor shall clean up the work site at the end of every work day and upon completion of the project, including removal of all debris and refuse from the site, to the satisfaction of the COR.

1.9. Supervision and Quality Control: The Contractor shall provide project supervision throughout the course of construction. The Contractor shall establish and maintain a quality control system throughout the project. The Contractor shall demonstrate skilled workmanship in constructing a quality product.

....

1.11. Quality Assurance: The Contractor shall perform Quality Control (QC) on all Contractor-installed materials and equipment. The Contractor QC shall report any discrepancies between what was ordered and what is delivered, implemented, and performed to the Government or Government QA Contractor within 1 day of discovery for resolution. No material

12

proposed may be substituted with an alternate product unless approved by the government prior to delivery. The Contractor shall correct all deficiencies reported by the Government QA or Government QA Contractor who will inspect the Contractor's work. The Contractor shall issue a QA certification statement to the Government validating that the installed system is free from installation deficiencies and defects for the support service period selected. This statement shall also certify that the Government documented contractor defects have been corrected and shall be submitted prior to submission of the final Systems Acceptance.

(R4, tab 1 at 205-07)

13. Section 2 of the SOW, entitled "SUMMARY OF WORK," broke the project down into three basic tasks. They are defined as follows:

> 2.2.1. **Task 1**. The Contractor shall build 1(one) ECP that includes 1 concrete guard tower and 2 guard posts.
>
> 2.2.2. **Task 2**. The Contractor shall build and install (2) two, double storey Connex Guard towers[.]
>
> 2.2.3. **Task 3**. The Contractor shall clean up any existing or construction-related debris from the construction site at the end of each day and at the completion of this project in accordance to Attachment #1-Standard Specifications, and Afghan National Law.

(R4, tab 1 at 207-08)

14. The SOW also included a detailed description of the three tasks:

> 4.1. **Task 1**. The Contractor shall level, compact and slope to drain the entire ECP area. The contractor will lay, level and compact 150mm depth of 20/40mm sized crushed gravel over the entire Depot 0 ECP footprint except for the area with the required concrete slab for the steel panel gates following the attachment #7 Proposed ECP-Depot 0. In addition the contractor

13

shall lay, level and compact 150 mm of 20/40mm sized crushed gravel in the transitional road connecting the ECP to the existing main access road as shown on the drawings.

4.1.1 **Concrete Guard Tower**; shall be built following the design in Attachment #3 Concrete guard tower and Attachment #6 Solar panel specs. The tower shall include 1(one) HVAC and 1(one) solar electricity self power system.

4.1.2 3 x **Hesco Walls**; shall be built in order to create a 2 (two) way traffic entrance and exit following the design of Attachment #7 Proposed ECP-Depot 0 and shall [be] constructed in accordance with Attachment #11 Hesco walls "para 8". The Concertina shall be installed on the exterior side of the HESCO walls for the two outside Hesco walls. The contractor shall deviate from the standard design on the middle Hesco barrier and not install the concertina wire on the 10B Hesco; it shall only be installed on the 8B. Contractor will stop 2m short of the panel gates to create a gap for personnel access.

4.1.3 2 x **Drop Gates**; shall be built at the entrance and exit as specified in accordance with Attachment #9 Drop gate standard design and Attachment #7 Proposed ECP Depot 0. The drop arm gates will be installed at the end of the HESCO barriers.

4.1.4 2 x **Guard Posts**; shall be installed beside drop gates and constructed in accordance with Attachment #7 Proposed ECP-Depot 0 and Attachment #10 Guard Post. The contractor will deviate from Attachment #10 Guard Post by not including any electrical components in these two guard posts. The contractor will provide and install one small wooden stove with metal exhaust tubing in each guard post.

4.1.5 **2 x Steel Panel Gates**; shall be installed at the end of the ECP in accordance with Attachment #7 Proposed ECP-Depot 0 and the Attachment #8 Steel Panel Gates. The Contractor will be responsible for

14

the adjustment of the steel panel gate's dimensions to ensure complete coverage of the road opening and complete. The contractor will submit design to COR for approval prior to installation.

4.1.6 **Chain Link Fence**; shall connect the existing fence to each side of the ECP with a 45 degree angle as shown in Attachment #7 Proposed ECP Depot 0. The fence construction shall follow the Attachment #12 Chain Link Fence Design. No sniper screen is required.

4.2 **Task 2**. The contractor shall build 2, double storey Connex guard towers along the fence perimeter of Depot 0 holding area. The guard towers will include HVAC and solar electricity self power system following design #6 Solar panel specs. The guard tower will follow all the specs of the design in attachment #4 Two CONNEX Guard Tower. The location of the guard towers are shown in attachment #5 Site Layout.

4.3 **Task 3**. The Contractor shall clean up any existing or construction related debris from the construction site at the end of each day and at the completion of this project in accordance to Attachment #1 –Standard Specifications, and Afghan National Law. **All damages of main access road shall be repaired at the completion of the project.**

(R4, tab 1 at 208-09)

15. With respect to the contract's period of performance, the SOW stated:

Tasks contained in this contract shall be completed no later than 90 days after date of contract award. Extensions will be requested no less than seven (7) days from expiration of the contract period. The Government reserves the right to terminate the contract within ten (10) days['] notice if Contractor fails to fulfill any of its obligations contained herein.

(R4, tab 1 at 208)

15

16. Regarding "Professional Conduct," the SOW provided:

> 2.5.1. In addition to performing the duties and responsibilities described above, the contractor will ensure that the contractor's staff performs their duties honestly in a competent and lawful manner and within the time required by the Employer. The tasks are to be accomplished in a way which will not cause the Employer to violate any laws or to breach the Employer's Contract or cause the Employer any embarrassment.
>
> 2.5.2. Implement, follow and obey any and all rules, regulations and systems of work devised by the Contractor which are hereby considered an integral part of this contract.
>
> 2.5.3. Act in a non-sectarian manner at all times with demonstrated respect for all ethnic, religious, and other groups that constitute the Afghan people and the members of the Coalition.
>
> 2.5.4. The Contractor shall comply with any mentioned Department of Defense and component specific publications and instructions, or the most current version of referenced material and its specified replacement, in performance of this SOW, unless otherwise noted.

(R4, tab 1 at 208)

17. The CO, Mr. Mark A. Penwell, issued Lean a notice to proceed, effective on 21 April 2013. He stated, in part: "You must complete all requirements of this project within 90 calendar days of the effective date of this Notice to Proceed or 30 July 2013." (R4, tab 6)[1]

---

[1] Since 90 days after the effective date of the notice to proceed is 20 July 2013 and not 30 July 2013, Modification No. P00001 was issued on 25 July 2013 to incorporate the actual completion date reflected in the notice to proceed (R4, tab 11).

18. Because Lean's workers were unable temporarily to gain access to the Afghan National Army compound where the project was to be performed, the completion date was initially extended to 13 August 2013 by Modification No. P00002, and then to 5 September 2013 through Modification No. P00003 (R4, tabs 12, 17; tr. 2/152-53).

19. On 3 June 2013, the CO issued a "Letter of Concern" to Lean. He stated, in part:

> 1. This letter of concern is being written to express serious concerns over the ECP and Guard Tower project. The US Government visited the site on two different occasions (26 May 2013 and 2 June 2013). The workmanship and materials that you have provided are inferior to what is described in the Statement of Work (SOW), Task Force Phoenix Standards, ANSF Standards and the contract. The COR, Mr. Steve Glass did not accept the work you [sic] that you had completed to date and sent an email on 28 May 2013 to correct the problems. When the US Government visited the site again on 2 June 2013, your company had torn down the previous CMU work and began to reinstall new CMU work. There were several problems noted on the new work that were not to standard. The concrete mortar mix that was used to adhere the CMU's together was lacking to standards mentioned earlier or missing all together. You also did not have an English speaking supervisor on site as outlined in your contract. It is the Contractor's responsibly to complete the work as outlined in the SOW, Task Force Phoenix Standards, ANSF Standards and the contract.
>
> 2. It is up to the Contractor to complete this project on schedule and obtain quality materials for the project. As the contracting officer, I have considered your duty to seek assistance and guidance regarding obtaining the materials and the overall workmanship; however, your failure to proceed or make progress and perform under the contract is placing the construction of this project in jeopardy. Performance of this contract must be completed in accordance with the SOW.
>
> 3. Failure to correct this matter in a timely manner will result in more serious actions. This will have a significant

impact on your overall performance rating on this contract and will jeopardize your ability to receive future contracts with the U.S. Government based on your past performance rating.

4. You are required to submit a response within three (3) calendar days of receipt of this letter by official letterhead memorandum format only. An email written response will not be accepted. Your response shall include a corrective action plan and a detailed schedule of completion for the construction of the ECP and Guard Tower Project. If you find the information in this letter to be incorrect or if you have evidence to support the delinquency, you are required to address that in your response.

(R4, tab 9 at 2) Lean's response, if any, is not contained in the evidentiary record; however, the CO testified that Lean "ultimately corrected" the concerns set forth in the letter (tr. 2/154; finding 7).

20. On 18 August 2013, Chief Kevin Locher, the COR, conducted a job site inspection and observed several deficiencies on Lean's part. Most significantly, Chief Locher noted that Lean had not installed the solar panels for the "two double conex guard towers." He also stated that the fence Lean has installed was of "poor quality." At the hearing, Chief Locher testified that these deficiencies were communicated to Lean's on-site representative. (R4, tab 13; tr. 2/13; findings 4, 9-11, 14)

21. On 19 August 2013, Chief Locher forwarded an email to Lean in which he noted other deficiencies which had surfaced during his inspection:

The other issues

1) The Chigo [HVAC unit][is] not working in the concrete tower at the ECP.
2) The hand rail on the exterior ladder has faulty welds and needs re-weld[ing].
3) In one of the conex towers (and possibly the other tower also) conduit from the panel had a water tight elbow going to the exterior light over the door. To get wire to the outlet for the Chigo, a hole was drilled in the elbow and ran loose to the outlet. This needs [sic] fixed.
4) Both electrical panels needs [sic] the breakers labeled in both Dari and English. Once these and the issues

18

LT Gorlsine outlined are completed we can hopefully get out and do a final inspection.

(R4, tab 14 at 1) The issues outlined by Lt Gorsline, the project engineer, related to various contractual specifications with which Lean had not compiled. Lt Gorsline described these deficiencies to Lean in the following terms:

1) 2 x CONNEX GUARD TOWERS:

SOW: The contractor shall build 2, double storey [sic] Connex guard towers along the fence perimeter of Depot 0 holding area. The guard towers will include HVAC and solar electricity self power system following design #6 Solar panel specs. The contractor will be responsible for determining how and where the panels will be mounted. The system shall be sized to provide 6 kW system output (7.5 kVA) indicated at full load rated power 1% mean ambient summer operating temperature. The guard tower will follow all the specs of the design in attachment #4 Two CONNEX Guard Tower. The location of the guard towers are shown in attachment #5 Site Layout.

Attachment 4 Para 12: Mirrors: The Contractor shall furnish and install tow [sic] Convex Security Mirrors as described in the drawings. Ref page 7 of attachment.

Attachment 4 Para 13: Sandbags: The Contractor shall also furnish and install 2 rows of filled sandbags stacked the entire height of the walls on all four sides of the bottom CONNEX unit.

2) ECP Fence:
- Fence tension wires are to be tightened as per description in attachment #12 Chain Link Fence Specifications Sub Para 1.3.3.

- Fence post footing dimensions are not consistent with the attachment #12 Chain Link Fence Specifications Sub Para 1.2.3: The post shall be set in concrete foundation with diameter of 30.5 cm (12 in) and 61 cm (24 in) deep. The minimum embedment length for the posts shall be 50 cm (18in).

19

- Barbwire on the top of the fence must be tightened and the Concertina wire lashed in.

3) Ref Sub Para 4.1.4 of SoW, Guard Shacks are to have small wood stoves in them.

4) Gravel must be leveled and compacted for the ECP in and out routes IAW SoW Task 1: The Contractor shall level, compact, and slope to drain the entire ECP area. The contractor will lay, level and compact 150mm depth of 20/40mm sized crushed gravel over the entire Depot 0 ECP footprint except for the area with the required concrete slab for the steel panel gates following the attachment #7 Proposed ECP- Depot 0. In addition the contractor shall lay, level and compact 150 mm of 20/40mm sized crushed gravel in the transitional road connecting the ECP to the existing main access road as shown on the drawings.

(R4, tab 14 at 2; findings 8, 11, 13, 14)

22. On 19 August 2013, the CO issued his second "Letter of Concern" to Lean. He wrote, in part:

1. This letter of concern is being written to express serious concerns over the ECP and Guard Towers contract. On 17 August 2013 you reported that you believed the contract was complete. When the COR went to the site, several discrepancies were found to include:

a. No sand bags in the bottom connex towers
b. No solar panels were installed by the connex guard towers
c. The period of performance is expired
d. The Chigo did not work in the concrete tower at the ECP
e. The hand rail on the exterior ladder has faulty welds and needs to be re-welded
f. In one of the connex towers (and possibly the other tower also) conduit from the panel had a water tight elbow going to the exterior light over the door. To get wire to the outlet for the Chigo, a hole was drilled in the elbow and ran loose to the outlet. This needs fixed [sic].

20

g. Both electrical panels needs [sic] the breakers labeled in both Dari and English.

h. Contractor shall furnish and install two Convex Security Mirrors as described in the drawings. Ref page 7 of attachment.

i. Fence tension wires are to be tightened as per description in attachment #12 Chain Link Fence Specifications Sub Para 1.3.3.

j. Fence post footing dimensions are not consistent with the attachment #12 Chain Link Fence Specifications Sub Para 1.2.3: The post shall be set in concrete foundation with diameter of 30.5 cm (12 in) and 61 cm (24 in) deep. The minimum embedment length for the posts shall be 50 cm (18 in).

k. Barbwire on the top of the fence must be tightened and the Concertina wire lashed in.

l. 4) Gravel must be leveled and compacted for the ECP in and out routes IAW SOW Task 1: The Contractor shall level, compact and slope to drain the entire ECP area. The contractor will lay, level and compact 150 mm depth of 20/40 mm sized crushed gravel over the entire Depot 0 ECP footprint except for the area with the required concrete slab for the steel panel gates following the attachment #7 Proposed ECP-Depot 0. In addition the contractor shall lay, level and compact 150 mm of 20/40 mm sized crushed gravel in the transitional road connecting the ECP to the existing main access road as shown on the drawings.

m. Ref Sub Para 4.1.4 of SOW, Guard Shacks are to have small wood stoves in them.

The U.S. Government does not take ownership of the ECP and guard towers until it has been constructed in accordance with the SOW. The period of performance for this contract ended 13 August 2013. One no cost extension has already been granted. The Contractor is required to submit a new schedule and excusable delay log.

2. It is up to the Contractor to complete this project on schedule and obtain the materials for the project. As the contracting officer, I have considered your duty to seek assistance and guidance regarding obtaining the materials; however, your failure to proceed or make progress and perform under the contract is placing the construction of

21

this project in jeopardy. Performance of this contract must be completed in accordance with SOW.

3. Failure to correct this matter in a timely manner will result in more serious actions. This will have a significant impact on your overall performance rating on this contract and will jeopardize your ability to receive future contracts with the Government based on your past performance rating.

4. You are required to submit a response within three (3) calendar days of receipt of this letter. Your response shall include a corrective action plan and a detailed schedule of completion for the construction of the ECP and Guard Towers. If you find the information in this letter to be incorrect or if you have evidence to support the delinquency, you are required to address that in your response.

(R4, tab 15; findings 4, 8, 11, 13, 14) Lean's response to this letter of concern, if it exists, is not part of the evidentiary record.

23. On 27 August 2013, Lt Gorsline and Chief Locher conducted another site inspection. Through an email of that date, they informed Lean of the results. They wrote, in part:

We conducted a site inspection of the Northern CONNEX tower foundation and found that the concrete was not to standard. The concrete did not have the appropriate aggregate and was mixed on the ground adjacent to the footing frame. Please acknowledge that you have received this email.

(R4, tab 18 at 1; findings 4, 7)

24. On 31 August 2013, the government conducted another site inspection. The results triggered a third "Letter of Concern" from the CO. He wrote, in part:

1. This letter of concern is being written to express serious concerns over the ECP and Guard Tower project. The US Government visited the site on two different occasions (27 August 2013 and 31 August 2013). The workmanship and materials that you have provided are inferior to what is

22

described in the Statement of Work (SOW), Task Force Phoenix Standards, ANSF Standards and the contract. The Engineer, Lt Deane Gorsline and the COR SWC Keven Locher has [sic] not accepted the work completed to date and has [sic] sent an email on 27 August 2013 to correct the deficiencies. When the US Government visited the site again on 31 August 2013, your company went ahead and placed the connex towers on the concrete pads that were not built to specifications outlined in the SOW and the TF Phoenix and ANSF Standards. It is the Contractor's responsibly [sic] to complete the work as outlined in the SOW, Task Force Phoenix Standards, ANSF Standards and the contract.

2. It is up to the Contractor to complete this project on schedule and obtain quality materials for the project. As the contracting officer, I have considered your duty to seek assistance and guidance regarding obtaining the materials and the overall workmanship; however, your failure to proceed or make progress and perform under the contract is placing the construction of this project in jeopardy. Performance of this contract must be completed in accordance with the SOW.

3. Your contract expires 5 September 2013. Your contract will NOT be extended without consideration from your company. Once the period of performance expires, your company will be in Default and subject to termination. Please provide your consideration for review/acceptance by the Contracting Officer. Failure to correct this matter in a timely manner will result in more serious actions. This will have a significant impact on your overall performance rating on this contract and will jeopardize your ability to receive future contracts with the U.S. Government based on your past performance.

4. You are required to submit a response within three (3) calendar days of receipt of this letter by official letterhead memorandum format only. An email written response will not be accepted. Your response shall include a corrective action plan and a detailed schedule of completion for the construction of the ECP and Guard Tower Project. You must also submit any additional information that you feel

23

is necessary as to why the US Government should not find you in default of this contract. If you find the information in this letter to be incorrect or if you have evidence to support the delinquency, you are required to address that in your response.

(R4, tab 19; findings 4, 14)

25. Through an undated letter, Lean responded to the CO's third letter of concern. Initially, Mr. Rassin acknowledged the deficiencies cited by government personnel. He wrote:

> I went to the site today and saw some issues such as concrete pad under the guard towers look not good, and very embarrassing issue was the aggregate in front of guard towers – the workers took it from car park – I do apologize for that. Despite that we had more than enough aggregate in our area which is more suitable for concrete, but workers did not bother to bring it from our area but instead took it from nearby car park – It is all about them being lazy. Likewise the supervisor in the site told me that he put good concrete under guard towers but when I visit the site it does not look good to me. Regarding the work progress I am more concern than you, because every day we are losing money or the slower they work the more we lose. The solar company gave us very bad time, they are working very slowly and unproductive. This Shirking problem is the biggest pressure, we feel very week [sic] in solving the issue, despite trying many incentivized compensations models but no good result so far, may be because here [in] Afghanistan, workers are shortsighted with no long-run business thinking. The last couple of days of thinking and discussion within our firm found that shirking problem among workers (the tendency to do less work when the return is similar) being dishonest, careless, and not having similar vision as the company, are the main factors that cause all these problems.

But then Mr. Rassin attempted to blame the deficiencies on the government personnel who were administering and inspecting the project. He stated:

> I think it will not be good for us to blame others, so we don't want to blame, but it will be good to at least share

24

our thoughts regarding issues at your end. One of the main problems at your end is personal issue, as we discussed this before we strongly believe that the new team has personal issue with us. Therefore they are biased and over critical. If you track their first few emails, you see they only asked a couple of deficiencies to be rectified but the more we worked the more they found excuses e.g. first they said, change the fence angle, then put more concrete under the post, then put tension wire, then make straight the concertina wire, then fix the gap at the top....I am sure they will go on and on.

(R4, tab 20 at 1)[2] As a part of Lean's efforts to rectify the deficiencies which he had acknowledged, Mr. Rassin wrote:

We are done with ECP, as we provided more gravel, fixed the faulty welding, the lights, the fence, the wooden stoves. We also brought the solar panels and barriers and other equipment, we only need to install it. Now the main issue is concrete pad under guard towers, please tell us your decision regarding this. Also it is important to mention that Afghan official desperately want[s] us to push back the location of guard towers, this is due to complain[t] from neighboring residents, they believe the guard tower breach[es] their privacy.

(R4, tab 20 at 3)

26. On 31 August 2013, Lt Gorsline and Chief Locher conducted another inspection during which they discovered several deficiencies in the concrete work. Lt Gorsline wrote, in part, as follows:

Myself and the COR for the ANA ENG Cell, Chief Locher, conducted a site inspection of the CSD ECP and CONNEX towers today 31/08/2013. We found that the concrete quality was as unsatisfactory as it had been on our site inspection on the 27/08/2013 as detailed below. Additionally, the appropriate cure times are not being followed. The concrete would have been poured between the 24/08/2013 and the 28th and the CONNEX towers were

---

[2] By "new team," Mr. Rassin was likely referring to the replacement of the first COR, Mr. Glass, with Chief Locher (tr. 2/9).

placed on the foundations as soon as the 31/08/2013. This work quality is unsatisfactory and reflects poorly on the competence of our departments if we allow this to continue.

My recommendation is encourage the contractor to complete the ECP and then to carry out a partial ha[n]d over of the ECP portion to the ANA. IOT complete the ECP the contractor must make the following reparations: fix to the Guard Tower lighting, place adequate amount of gravel on in and out routes, and install stoves in the Guard Shacks. At this point the contractor can be paid for the work that he has completed.

We conducted a site inspection of the CONNEX tower foundations on Aug 27 2013 and found that the concrete was not to standard. The concrete did not have the appropriate aggregate, was mixed on the ground adjacent to the footing frame, and rebar was exposed in certain areas.

(R4, tab 21 at 1; findings 4, 7, 13-14)

27. On 3 September 2013, the government conducted another site inspection. Its representatives noted some improvement but also many deficiencies which had not been rectified. The government's situation report (SITREP), which included several photographs of the site conditions, stated:

> Was on site today and there was some unexpected progress. Mainly in the way of solar panels being installed by the two double conex [sic] towers.
>
> Although the stands for the panels at the moment are nothing more than rebar welded on the stands and drove into the ground. This won't be acceptable of course. The workers on site said they thought it was going to be put on blocks. Stairs support has been installed and sandbags are being put in the lower conexs [sic] per the SOW. Welds on the concrete guard tower hand rail has been repaired. The light fixture in concrete tower fixed but there isn't any power to the whole tower so not sure if it works.
>
> No work on the ECP area as far as gravel and fixing the fence problems. They stacked CMU blocks under the guard shacks. Fences and tension wire still not stretch[ed]

26

tight. Gravel still not brought up to thickness indicated in SOW. Concrete at ECP area is not up to quality as well. Gates needs adjust[ing]. Wheels aren't touching ground.

Drainage through the wall will need to be re-dug to allow run off to run to the ditches. The pad Concrete not to standard. Thickness is good but easily chips away and very little agragate [sic] in the mix.

(R4, tab 22 at 1-4; findings 4, 7, 9, 11, 14)

28. On 10 September 2013, Lean forwarded an email to the CO in which it stated that it had completed the ECP portion of the contract (R4, tab 24 at 1). On 24 September 2013, Lean forwarded an email to the government, stating as follows:

The subject project was complete and ready for handover on Saturday (21/09/2013), I emailed to Mr. Mark Penwell to come for handover, but I never received any reply from Mr. Penwell.

Regarding your point (problems in the project) I should say there is no problem in the project (project is absolutely fine), the problem is the COR, I knew that because of personal issue the COR is not going to accept the project—5 weeks ago, he sent us a list of tasks that we have to correct which we did.

Also I should point out that in the last couple of weeks I never received any feedback from COR to tell us about the problems in the project. I mentioned this issue in our official Memorandum (COR is not willing to contact us) informing Mr. Mark Penwell that once our project is complete we will not accept any changes, but Mr. Penwell did not do anything about this and we received no email from USG telling us about any problem. So, we ended our contract with our workers and sub-contractors, hence we cannot do anything now and we are sure that the project is absolutely fine, please kindly process our payment as the USD exchange rate is badly changing and we are losing.

Moreover, I want to inform you that ANA started using the Guard tower (see photos), now using our facility and not paying for that is not FAIR.

(R4, tab 26 at 1)

29. On 29 September 2013, the CO accompanied by Chief Locher and Lt Gorsline, conducted another site visit, relying upon Lean's assurances that the project had been completed. By this point in time, the revised contractual completion date of 5 September 2013 had elapsed. In his memorandum of 29 September terminating the contract for default, the contracting officer noted deficiencies with the concrete slabs under the feet of the CONNEX towers, unacceptable installation of the solar panels, failure to provide a certified electrician, defective welds, unfilled sandbags, failure to install gravel in the ECP area, and improper installation of the wood stoves in the guard towers. The CO concluded that the contract was not complete and that it would take Lean "considerable weeks to correct" the various deficiencies. (R4, tab 28 at 1-3) A cure notice requirement was not contained in the Default clause (finding 3). However, the government reserved "the right" in the SOW to issue such a notice. That the government chose not to exercise this right does not affect the efficacy of the termination under the facts presented here (finding 15).

30. During the site visit of 29 September 2013, the CO stressed to Mr. Rassin that Lean could only be paid for the work which it had completed in accordance with the SOW. Mr. Rassin became very agitated and replied: "Your attitude[] and poor representation of the American Government is [sic] going to result in increased insurgent activities." (R4, tabs 27, 32) The government representatives who were present viewed this as a threat and immediately left the project site (R4, tabs 33, 34). Despite his defiant attitude at the parties' meeting of 29 September 2013, Mr. Rassin, in his hearing testimony, conceded several of the deficiencies noted by the government. For example, he admitted through one of his photographs that his forces had constructed only half of the concrete slab under the steel panel gates, as required by the contract (tr. 2/93-96; findings 4, 7, 13). In addition, Mr. Rassin admitted that Lean did not comply with the contractual requirement to provide 150 mm of 20/40 mm crushed gravel over the entire ECP footprint (tr. 3/21-22, 102; finding 14). Also Mr. Rassin admitted that the guard posts were placed on concrete blocks, rather than on a concrete foundation. Indeed, he opined that a foundation was not even required. (Tr. 3/30; findings 4, 13-14, 24, 26) Also, Mr. Rassin admitted that Lean did not install concrete footers for the solar panel array frame (tr. 3/86-89; findings 4, 9, 14). Finally, Mr. Rassin admitted using parking lot gravel for the concrete used for the CONNEX guard tower foundation. He also conceded that Lean never corrected this deficiency (tr. 3/136-37; findings 4, 7, 12-13).

28

31. On 1 October 2013, the CO forwarded another notice of termination for default to Lean, in which he stated, in pertinent part: "The period of performance ended on 5 September 2013 [and] you have only completed 73.96 percent of the project" (R4, tab 30 at 1). This completion percentage was based upon detailed calculations performed by Lt Gorsline and Chief Locher. Using the "Bill of Quantities/Materials that was provided by Lean" as part of its proposal, the project engineer performed the following tasks:

> I have systematically gone through each task and assigned a[n] overall percentage of completion for each task.
>
> I based it equally on the percentage of work complete as well as the percent of materials provided.
>
> I took the value being charge[d] by Lean Corps for each task and applied the percentage completion.
>
> I took the final value of work completed and divided it by the work Leans Corps was billing us for to find the TOTAL PERCENT COMPLETION: 74%.

(R4, tab 29) This percentage figure gave Lean credit for various sub-tasks which it had not fully completed. Attached to Lt Gorsline's memorandum were various photographs depicting the state of work on the contractual sub-tasks after Lean had completed its efforts (R4, tab 29, *passim*). At the hearing, Chief Locher gave credible testimony describing the analysis which he and Lt Gorsline had performed regarding the completion percentages of the various sub-tasks in minute detail (tr. 2/69-77).

32. On 15 November 2013, Lean timely appealed the CO's final decision to this Board. In its complaint, Lean alleged that it had completed 100% of the work on the project (compl. ¶ 15).

## DECISION

It is axiomatic that the government bears the burden of proving that a default termination was proper. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 763 (Fed. Cir. 1987). Moreover, it is settled law that a default termination is a drastic sanction which should be sustained only for good grounds and on solid evidence. *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969). If the government establishes a prima facie case that the termination was proper, the burden of production, or going forward with the evidence, shifts to the contractor. *Benju Corp.*, ASBCA No. 43648 *et al.*, 97-2 BCA ¶ 29,274 at 145,654.

Here, the government has met its burden. Although the contractual completion date was extended from 30 July 2013 to 5 September 2013 through two modifications (finding 18), Lean did not complete the work. Throughout the performance period, the CO kept Lean informed of its deficiencies through three letters of concern (findings 19, 22, 24). Despite continual efforts on the parts of the CO, COR, and the project engineer, Lean was unable to rectify its deficiencies and to complete the project (findings 19-31).

In its pleadings and at the hearing, Lean argued that it had, in fact, performed 100% of the contractual requirements. This contention is not persuasive. The analysis conducted by Chief Locher and Lt Gorsline demonstrates that, at best, Lean completed 74% of the work by the revised contractual completion date (finding 31). Hence, we must reject Lean's argument in this regard. Referring to an earlier alleged conclusion by Mr. Glass, the first COR on the project, that it had completed 80% of the project, Lean contends that he signed a DD250 form to this effect and that the completion percentage could not have declined from 80% to 73.96% (app. br. at 3): However, a review of Mr. Glass's testimony reveals that the 80% figure was only an approximate number. Moreover, there is no record evidence that Mr. Glass executed a DD250 form to this effect (tr. 2/216). Finally, as part of his inspection, Mr. Glass never inspected either the solar panels for the CONNEX guard towers or the towers themselves (tr. 2/217-21). Based on Mr. Glass's testimony, the Board declines to give credence to the 80% figure.

Lean also attacks the probative value of the site photographs used by the government to demonstrate the various deficiencies which had not been resolved at the time when the contract was partially terminated for default (app. br. at 18). The Board also rejects this argument. Chief Locher vouched in his testimony for each of the photographs, explaining when and under what circumstances they were taken. In addition, the CO, Mr. Penwell, testified that he accompanied Chief Locher and Lt Gorsline to the job site on 29 September 2013 and reviewed each part of the project to determine what were discrepancies and which part of the work was properly performed. (Tr. 2/70-77, 161)

Lean also contended that the default termination was the result of a personal animus against it by government personnel (finding 25). There is no credible record evidence of any bias against Lean by any government representatives. Accordingly, we also reject this contention.

## CONCLUSION

The appeal is denied.

Dated: 18 May 2016

MICHAEL T. PAUL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59016, Appeal of Lean Construction and Engineering Co., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

31